Sprint Spectrum LLC v. Sprint Spectrum L.P. Sprint Spectrum LLC v. Sprint Spectrum L.P. Sprint Spectrum LLC v. Sprint Spectrum L.P. Sprint Spectrum LLC v. Sprint Spectrum L.P. Thank you, Your Honor. May it please the court. I want to go a little bit out of the sequence of the briefing and analyze what, at least in my mind, is unquestionably the single and fatal flaw in the district court's approach in this litigation. And that's the treatment of the AT&T settlement. I have to be a little bit careful, because a lot of the AT&T settlement is under wraps on confidentiality. But it does seem to me absolutely clear that the use of the settlement, both in terms of trying to measure damages and ultimately in determining liability, was way beyond the bounds of what's permissible. And as a consequence, not only should the damages be retried, the liability as well. I want to start by taking what may be viewed as a somewhat more provocative position, but I think it's important for the panel to take it into account in evaluating the whole question. Because I know this court has said in laser dynamics there's a strong presumption against the use of settlements as a basis for measuring damages. But I would go back further to where the US Supreme Court was in the Roode case in 1889. And the language of that opinion is strikingly powerful. And I'll just take the time to read it. It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented. And determining the damages sustained by the owners of the patent in other cases of infringement. I don't see, that's not a presumption. That's a fat categorical statement from the US Supreme Court. And I know of no decision in the intervening years that remotely casts doubt on the continuing vitality of that position. And if that's true, then the entire exercise of putting the AT&T settlement before this jury was completely illegitimate. And it's by itself, I would argue, a basis for setting aside the verdict in this case and planning a trial. Can you clarify this for me? Am I right that at least you didn't object to the other litigation settlements coming in? We did not at the outset of that. That's true. Those were substantially smaller settlements. And so we were willing. They were all in settlement of litigation as well, correct? They were all in settlement of litigation. And candidly, the other side objected to them and could have legitimately said, none of that should be legitimate. Oh, I see. So it's not just that you didn't object, you actually offered them. We suggested that, yes, we did. And they objected, and they're not in the case. I mean, we know about them, but they were not part of the evidence in this particular case. The only evidence in this case of a prior settlement is the AT&T settlement. And what I'm suggesting to you is that that was just wrong. I thought those other agreements were part of this case. My understanding is, OK, then I'm mistaken. I thought for some reason they had actually been stricken. But regardless, at the end of the day, there's no question that the party's positions have shifted on this. Because at one point, all of the settlements were relatively small. And then one, obviously, is outside the normal range. And that, not surprisingly, causes the parties to rethink their position. But at the end of the day, from my perspective, what the court has to do at this stage is say, what's the law? And the law from the US Supreme Court in Rood, which as far as I can tell, has never been. And we did object to the use of this. And Rood was what kind of case, just to remind you? It's a patent case. And it's not, this is not just dicta by the Supreme Court, which hopefully you wouldn't cast aside anyway. But I mean, this is a case in which the court said there is no evidence of damages in this, no legitimate evidence of damages in the case, set aside a verdict on the basis that that use of that settlement was invalid completely. So that's the holding of the court. Mr. Phillips, let me ask you this. I can certainly understand, sort of conceptually, that if a party is under the compulsion of litigation, that financial terms of resolution might be viewed as skewed by the fact that there's the compulsion of litigation there, the threat and all of that. But at the same time, it's fairly well-recognized that if you get, by the time you get to the end of the preparation of a lawsuit, and you're either about ready to go to trial, or the trial is about finished, if parties compromise, it's not unusual where the parties will come in and basically sort of split the difference. You asked for $100 million. I think I should get away without paying anything. Let's settle it for $50 million. Why is that not relevant to the issue of damages, where the parties may be similarly situated, say more similar patents, say more similar operations, et cetera, et cetera? I mean, I have two answers to that, Judge Lynn. One is, it seems to me the US Supreme Court's told us categorically that whether that's practical or not, that's not the law of the land. And if it should change, there are mechanisms for doing that, obviously. One is modify Rule 403 or Rule 408 to take this into account, or to recognize that, or to modify the patent statute if you think that there ought to be a specific and special rule for dealing with patent litigation. But in the absence of that, I don't see any basis for the court to say, well, as a matter of policy, it would be better to, or at least we can imagine circumstances in which that evidence might be valuable. I think in this particular case, as I say, I think the rules categorically, I don't think there's any basis for allowing that evidence in, in this case. But even if you went beyond that, and you go to the laser dynamic criteria, where the court said generally there's a strong presumption against using it, but on occasion you can't if certain circumstances don't attend. And in this situation where you're talking about a vastly larger number of patents than were as part of that settlement than are at issue here, where you're talking about a settlement that is multiples beyond any other settlement that's been applied in this case, where it's executed two and a half years after the hypothetical negotiation. There's some indication that a lot of those patents were really not that germane. Right, but one of them clearly was. And it was significantly lower. And it does seem to me, again, to me, this is why I think the Supreme Court's rule makes the most sense. Let's get out of the business of doing this and force plaintiffs to come up with a better theory, rather than using litigation to pound us. Rescue net was wrongly decided. I'm sorry? Rescue net was wrongly decided. Well, rescue net. Yes, I think at the end of the day, it probably was. And AstraZeneca. Well, AstraZeneca was mostly. I mean, yes. I mean, those are kind of dicta, because the court was vacating and remanding and saying the lower court ought to take into account how to evaluate this. And it ought to be very careful. And so in that sense, I'm not sure. And clearly, nobody had made the Root argument quite as aggressively. Would you say that Rule 408 tracks the holding of Root? That 408 represents an articulation of the holding? I don't know that it articulates it quite as dramatically. But it seems to me quite clear it's not intended in any way to cast doubt on the appropriateness of Root, particularly as it applies in a patent context. So it would seem to me that you would want a lot more evidence from the advisory committee on 408 to suggest that it meant to modify the rule in Root than you've got, which is nothing. And so from my perspective, from where this court's sitting today, that ought to be its assessment of this. And I don't want to be clear, because not only did this go to the issue of the measure of damages, because the correspondence between the ultimate verdict and that settlement is stunning. And so it's pretty clear to me that it did affect it. Laser Dynamics discussed Root, right? It quoted it. And that's all it did. And then it went back to RescueNet, and it said that the rule is, and that's the end of the inquiry. Can I just ask, in the district court, my recollection, correct me if I'm wrong, is that you did or did not make an argument to the district court that, wholly apart from 403 balancing, agreements and settlement of litigation are simply inadmissible? And I mean, we quoted Root. But it's a little hard for me to see how you could have made that, since you were promoting the admission of a whole bunch of such settlements. I mean, we made the argument under 403. I would say that it's fairly subsumative within 403 at this point for this court to evaluate. I mean, I don't think there's any question. We objected to this particular settlement going in on 403 grounds. We did, in fact, cite Root as part of that. We did not specifically advert to 408. We certainly talked about the laser dynamics standards. It just seems to me, at this stage, it may be not as clean as you might want it to be. But there's no question that the issue of the admissibility of this particular settlement is squarely posed for this court. And the answer, I would say, under Root is absolutely not. And then I would say, if you don't want to go that far at a minimum, say under laser dynamics, it's clearly not. And then that's why you have to go beyond. Not only did the plaintiff run with this in pushing as aggressively as possible on the issue of damages, but went on to deal with liability. And because a lot of this is confidential, I'd ask you to look at the pages 26 and 31 through 32 of our reply brief, where we go through in each of the instances in which the plaintiff's counsel, either through witnesses or through argument, consistently said that these are the same activities that were AT&T. This is not a question of damages. This is going to the conduct of my client vis-a-vis AT&T and saying that that settlement not only speaks to the question of how much you should punish us as a consequence of this, but that you ought to find that the behavior of Sprint under these circumstances corresponds to that for AT&T. And as a consequence, what I would ask the court to do is to set aside the entirety of the judgment and allow a new trial under those circumstances. If the court goes down that path, I would hope that the court then would also recognize the problem that's embedded in the O2 micro issue in this particular case. Because there is little doubt, in my mind at least, that while the district judge admirably construed the claims appropriately at one point in time, he allowed that construction to completely fall apart when the time came for the expert opinion to come in. And again, this is laid out carefully in the district court's own opinion, where he's talking about the controlling organization and then the insert of the word single controlling organization. And the expert minor says it has to be a single controlling organization. We said there's nothing in the construction of the patent that permits for that. We asked the district court to take that issue up. I was a little confused about the following. I'm not so much talking about the red brief here, but what the arguments were below. Was the theory of the other side that for particular wireless calls, there was no single controller over the path that a individual call took? Or only that there was no single controller over the multiplicity of several dozen different back home paths? I'll let my friend answer that. But I understood the argument to be the latter, not the former. Only the latter. Yes. That was my understanding of it, which is why I would say that that also has a problem with dealing with the path through, as opposed to the path to. Because I think with respect to the path to, that's clearly the ethernet. That's clearly a private line. And that's not what this patent's about. And as a consequence of that, it seems to me that on remand, if I'm right, that the court ought to set aside, because of the damages mistake, that on remand the court also ought to at least ask the district court to construe this particular provision and to do so in a way that will allow this case to be properly tried on remand. If there are no further questions, I'd like to reserve the balance of my time, Your Honor. Thank you. Thank you. Mr. Andre? May it please the court. Can you start where I was, where I had just, with my last question. Can you clarify? That the idea of single controller was an idea that was being applied to the path a particular call takes, or only the collection of 40 some backhaul paths it is? It would be, for the most part, both, Your Honor. It wasn't just. I'm sorry, for the most part, both? Well, I mean, it would be one situation. It didn't come up at trial, to be quite frank. They didn't raise it. But if you were to look at a call, a single call takes, to go from any location to the home network, a single call would go over multiple different owner's networks. So it would be. I want to just try to be clear. Put completely to one side that very small proportion of femtocells, picocells, and stuff, and just talk about, just focus on the ones where there's several dozen backhaul networks. OK, now speak about only those. And I was, Your Honor. The femtocells and picocells are not even really in dispute. They more or less stipulate to infringement on those million access points, because they stipulate. OK, so was it your position that there needed to be, but there wasn't a single controller on an individual call that transited only backhaul networks? The AAV backhaul network? That's correct, Your Honor. So our position is there's no controlling organization that controls the network that a single call would transmit from the cell tower to the Sprint home network. So there would be multiple entities. There'd be multiple backhaul networks, not a single one. There'd be a single backhaul network, but that backhaul network is made up of multiple AAVs, multiple vendors that control each of their own portion of the network. So you might get, if I make a call from San Francisco, California, and it's not really, it doesn't really cause more data usage. If I'm going to try to stream music from California, and it's going to go to Sprint's headquarter in Philadelphia, for example, it's going to transmit that one streaming request, it's going to transmit over a single backhaul network that is controlled by multiple companies. Because each portion of that backhaul network is controlled by that company. So there's no controllers. Do you happen to have a JA site to that proposition, that an individual data transmission going over the Sprint backhaul network is fairly often, always, whatever, going to transit pieces controlled by distinct AAVs? I'll try to pull it. It wasn't raised at the time at the trial in the court below. It wasn't raised on appeal either, that single call versus multiple calls. The networks themselves are made up of multiple AAVs. And there is a hypothetical situation, just to be candid, that if you were close enough to Sprint's home network, it may transmit just a single AAV provider. That's the reason I said for the most part. Usually, it would be multiple AAVs. So that's the reason I kind of qualified my answer earlier, Your Honor, because I didn't want to mislead the court. Wasn't the judge, I guess, in resolving the motion to exclude Miner on the idea of a single controlling organization, the judge seemed to be talking in terms of an aggregate network, how the internet represents a network of networks, and it's an aggregate. And so it was asking the question, well, that the jury would have to answer the question of whether Sprint controlled the aggregate network or had sufficient control of the aggregate backhaul network to the extent that Sprint could be said to be a controlling organization over the entire backhaul network made up of a bunch of smaller AAV segmented networks. That's correct, Your Honor. The judge resolved the O2 micro issue by saying that expert Mr. Miner's opinion was not in opposite of his order, the Martin order. And they said what the question of fact is, does Sprint exercise sufficient control over the network where it would be no controlling organization? That term itself, the way he construed it, is singular. It's not no controlling organizations. It's no controlling organizations, singular. And when Mr. Miner was pressed in his deposition, they go, do you mean no single controlling organization? He says, that's how I'm reading the order. That's how I'm interpreting it. It's grammar, it's English. No controlling organization is no controlling organization. And so when he was pressed, he said no single. They brought up to the judge. The judge resolved the issue, and that's on the APX 93 and 94, where he was very clear that Mr. Miner's interpretation of the Martin order was not inconsistent with his understanding, and that the question of fact was going to be whether or not Sprint exercised such control. And that was a question of fact. Can we switch now to the AT&T agreement issue? Can you start by talking about the rude Supreme Court case, both its merits and whether it was properly raised, and anything else? Because I don't think you cited it in your brief. It was raised on, it wasn't raised in the opening brief. It was raised in reply of leave. No, I thought it was raised. It's in the brief. The rude case, I think the substantive federal circuit cases, from laser dynamics to rescue net, they dealt with this as well. As Judge Lemann was saying earlier, the fact that a settlement agreement's come in is good law. In fact, if they if they Well, let me say, I mean, I think Mr. Phillips was clear about saying that he doesn't think any of that is good law because the post-rude federal circuit cases are inconsistent with root. So I'm actually quite interested in your explanation why they're not inconsistent with root. I don't think root is quite the bright line test that my friend is saying it is. I think the rude case is more in line with trying to not allow unduly prejudicial information in under 403 than it is a bright line test that no settlement agreements can ever come in. And so in patent cases in particular, if the settlements are used specifically for damages, which they were in this case, then we get around 403. And in the case below, Sprint actually fought and won to get all the settlement agreements in, as you pointed out. They got in the rim settlements and several other settlement agreements. So it's conceivable that that might be viewed as a waiver of any rude argument. Absolutely. That's an absolute waiver, as is their 408 argument, which they never raised at all. The fact that Suppose I didn't put aside waiver. Do you remember enough about the rude case to explain why there's wiggle room there in a way that Mr. Phillips suggests that there is not? I do not have that. I would not be able to distinguish at that level. I know it was cited in the laser dynamics case and the subsequent cases, and they distinguish over the rude case, allowing settlement agreements in for very specific purposes. And in fact, the law that we deal with in district court is if you don't address settlement agreements, there's a good chance it's going to be remanded back. If your expert witness does not look at settlement agreements in the context, that's the basis for reversal itself. So in one sense, we have controlling law that tells us if we don't consider settlement agreements, that's reversible. And now there's a new suggestion on the table that if you do consider settlement agreements, that's reversible as well. That kind of ties a patent owner's hands considerably. Do you have more questions about the settlement agreement? I can answer. I do want to address a couple more things. You can talk about whatever you want to talk about. At this point, questions may arise. That's fine. I do want to talk a little bit about the fact that much of what is being discussed in the opening brief has been waived. They did not raise this in the Rule 50 motions. I think that is a fatal flaw to much of this appeal. And by not raising it under Eighth Circuit standards in the Rule 50 motion, then those arguments are waived in totality. That's right, but assume for purposes that they are not entitled here to a judgment of no infringement, but at most a new trial. So just assume that for now. What do you say about their O2 micro argument? Well, the O2 micro is a very limited understanding. I know, Your Honor, I just mentioned that they have very few of the pico-infimto cells. In reality, they have much of it. No, no, no. I think what I meant was that a very, very small proportion of their total accused calls go over those cells. The traffic, they put in evidence at the court below that the amount of traffic that goes over the femto and pico cells is very small. It was not contested because it wasn't relevant. The evidence that went in below was that over 96% of the access points that travel from data transmission go from access point to the home network. 96% of those access points are the femto and pico cells. And they admit they use the internet. So infringement is already agreed to. There's no dispute about infringement. But that infringement doesn't quite match the portion of infringement on which your expert based damages. Is that right? No, and that's not quite correct because the expert actually talked about those femto and pico cells. He says, I didn't give a number on damages for those because it would have been astronomical. The cost to replace the lines for all those internet lines to make a private network would have been a magnitude larger than it would be just for the 40,000 cell towers. But so he wanted a lower number. Facts went in to allow the jury to consider those femto and pico cells. And our expert, we didn't get our number from the expert. Our expert had a much higher number. The jury came down with a lower number. And the facts that went in, the jury could consider for damages. It could have been based on those femto and pico cells. There was industry reports put in about how it would cost to replace those lines. And there was testimony that was not disputed by any of the experts for Sprint that the cost savings that Sprint recognized by using the internet on those femto and pico cells were astronomical. He said at least a magnitude of 10x larger than what was realized by using the AAVs instead of having their private network. So there were facts for the jury to base damages on in the court below. Those are undisputed facts. So I don't know where the jury came up with the $30 million number. It wasn't our expert who had a higher number. They didn't have an expert. They didn't give an alternative damages theory. The jury heard facts. And based on the Motorola case, that alone is enough for them to come up with a damages number. Do I remember right that the basic theory, conceptual theory of your experts' damages was it's very important to have a pretty high degree of security on these networks. There are ways of getting some okay security, and we talk about them in the specification. But in a competitive business like the wireless business, the fact is unless they were licensing, they would have had to build their own network. And then he used, I think in theory, I mean, what he said in theory was a very conservative cost estimate of what they would have had to build. And it's based on that cost savings that his damages theory asked for a particular number. That's right. It was something he took a very conservative approach. He looked at the cost savings in a very conservative manner, and then took a small percentage of that cost savings. So he apportioned on multiple grounds and came up with a very small number of what he thought would be shared. He said that Sprint should keep 96% of their cost savings. And just for purposes of your cross-appeal, doesn't the nature of that theory make it at least reasonable for the district court to have concluded that the jury award was a one-time cost savings and not an amount that would increase with further usage for the next two years of the patent? Yeah, it would be reasonable. I agree with you, Your Honor. It would have been except for one thing, that jury question. Okay. The jury question came back, and I was actually, tried the case at the district court. And when you get a question from the jury like that, you're obviously very happy about the question, because now we're talking damages. But we tried to say, we let the jury consider the two years going out, make it a one-time payment, because they wanted to know if it would be a license going forward. And Sprint was vehemently saying, no way, this is only for past. So the answer went back to the jury, no. And that fact that happened, the jury question, makes it less reasonable for the judge to say it was a fully paid license for the entire time. And I think that is very telling that if the jury didn't have that question, I don't think we'd be sitting here with a cross-appeal today. But because of that jury question, that was very telling, and they only awarded past damages. All the facts that went in were for past damages. You mentioned a few sentences ago, Sprint argued, made certain arguments to arrive at the judge's answer to the jury question. Is that discussion that you just referred to in the? It was on the record. It was a phone call that the judge had with the jury question, and basically they won out, and the answer was no. The adversary makes much of the fact that the question mentioned four patents and not two. What's your comment on that? I think the jury just made a mistake. It was clear there's only two patents. They had a jury form. They filled out for the two patents. I think it was just a slip. Thank you, Your Honor. Thank you. A few minutes. I'll try to be very brief, Your Honor. Thank you. First of all, it seems to me you put your finger on it in terms of what is the footprint of the patent and the damages theory in this particular case. You cannot construct or try to reconstruct a jury verdict in this case at damages at that level based on an expert opinion that goes exclusively to the notion of creating a backhaul and using a methodology of trying to figure out what that costs, which is completely made up, and try to apply that back to those Femco and Pedro cells. I mean, it's not completely made up, and this is a case in which fundamentally they put on a damages case and you didn't. If you're not gonna use licenses, then I think an economically, or an approach to this that is supported by lots of economists is figure out what the non-infringing alternative would have been. If the non-infringing alternative here would have been construct a whole network, that's kind of what he went about doing. And then he said, here's the cost, and basically we want 3% of the cost savings, not 90 something. And what I was talking about was the second half of that, which is how do you go about figuring out the cost? He didn't go about figure out the cost of actually constructing a backhaul Ethernet system. He went about renting a backhaul Ethernet and then threw that all together. But as I understand it, his theory was, this is a very conservative estimate of the cost because they wouldn't be paying this year in and year out if it were cheaper for them to build. So the cost must be bigger, it must be larger than what they're paying, otherwise they would have built it. Right, all I'm saying is that whatever number he came up for over the cost, is to my mind at least purely speculative because it's based off of an analysis of the lease arrangements, which has nothing to do with the costs and takes into account a wide range of other considerations. And I don't think that ultimately, to me the real problem in this case is going to still be the use of the AT&T settlement. I don't see any way, and I didn't hear anything that he said that remotely suggests that. And to be sure, would this be cleaner if we had not ourselves put forward settlements consistent with what we thought laser dynamics permitted? To be sure. On the other hand, when the settlement that was beyond question prejudicial came into the case, at that point we quite rightly objected to it. I gather, I'd forgotten about it in our post-trial motions, we also argued for 08 specifically as well. But the bottom line is, is that we preserved that issue, objected to it strenuously, and candidly, it never should have gone into the case. I hope obviously that you don't get to the cross appeal for obvious reasons. But when the question came back from the jury, our only answer was the answer to that question is no. And the reason we said no was because we thought the jury misconstrued the four patents involved in the AT&T litigation versus the patents here, and that the jury had in mind. But in any event, the reasons are not on the record, so. Exactly, Your Honor. Thank you. If there are no further questions, I urge the court to reverse. Thank you. Case is submitted.